At a Court of Oyer and Terminer held at this term, Harley G. Brown was indicted and tried for the murder in the first degree of George Babe, in Brandywine hundred, on the 29th day of June preceding. The first count in the indictment was framed under Section 20, Chapter 128 of the Revised Statutes, pages 775, 776, which among other things provides that if any person shall willfully and maliciously place any log, stone, bar, or obstruction on the road-bed or track of any railroad within this State, with intent to displace, or throw off, injure or destroy any engine, tender, train or car running or being thereon, and any engine, tender, train or car shall be thrown from the track, and *Page 541 
any person shall be killed by reason of such obstruction, injury or act, the person so offending shall be deemed guilty of murder of the first degree and of felony, and shall suffer death. The indictment alleged that the prisoner on the day mentioned and in the hundred mentioned, willfully and maliciously placed a cross-tie or sleeper on and across the road-bed and track of the Philadelphia, Wilmington and Baltimore Railroad Company, with the felonious intent to throw off an engine, tender and train of cars then running thereon, and thereby threw the same off the railroad, and by reason of such obstruction and the throwing off the said engine, tender and train of cars, the deceased was killed. There were several additional counts in the indictment for murder of the first degree drawn under the general statute.
The prisoner was at once suspected, and on being arrested for the act of placing the obstruction on the railroad, voluntarily confessed it, first to a detective in the employment of the railroad company, and afterwards before the jury in the coroner's inquest held over the dead body of the deceased, and the dead bodies of three other persons, and all of whom were instantly killed in the catastrophe which speedily followed it; and on both occasions made a voluntary statement of the way in which he placed the obstruction on the track, and his motive for doing it. It was placed on the track of the railroad a short distance below the station named Claymont, and the train thrown off by it was called the fast through train from New York to Washington, and had only been running about one year at that time, consisting of a locomotive, engine and tender, two express cars, a postal car, a baggage car, two passenger cars and two sleeping cars, and containing about seventy passengers, which left Philadelphia for Baltimore at twenty minutes before ten o'clock on the night of the 29th of June preceding, being ten minutes behind its usual time of departure, and was running at the rate of about fifty miles an hour, (the usual speed of it when on time being *Page 542 
forty miles an hour,) when it reached the obstruction and was thrown from the track by it about thirty minutes afterwards. The deceased was the locomotive engineer of it and was then in the cab of the engine, and was killed in the almost total wreck and destruction of the cab, and whose dead body was soon afterwards found under the fragments of it in a ditch along side of the railroad into which it had been hurled by the immediate crush between the tender and the engine. The conductor, as soon as he could, got out of the train and after starting a messenger up the road to stop any train coming from that direction and also a messenger down the road for the like purpose, proceeded up the road towards Claymont station, and about a hundred and fifty yards from the train, and not over fifteen from where the obstruction had been placed, he met the prisoner who touched him on the shoulder and said to him that he did all he could to stop it, and when asked by him where he was, and if he was on the train, he said no, that he was on the ground, and when asked what he was doing there, and what he wanted to stop the train for, he said there was a cross-tie on the track, and when asked why he did not take it out replied that he tried, but it was jammed in so tight that he could not do it, and that he then heard the whistle and the train coming and stood on the track until he had barely time to get out of the way of it, and did all he could by calling aloud and waving his handkerchief to the men on the engine as it came, to stop it, but it was going so fast and with a long blow from the whistle that they could lot hear him; he was then asked if he was going to stay there, or where he was going, and said he was going to stay around there, and that his name was Brown, and at any time he could be found about Wilmington.
The prisoner had been apprehended that night on suspicion for the offense, and committed to the cells of the city hall in Wilmington, and on the next day, after being apprised by the officer before referred to that he was satisfied that he was in a terrible position and his life was in *Page 543 
danger, and requested and admonished to tell him the truth, he burst into tears and said that he did it, and when asked by him what could have induced him to commit such an act, stated that he was out of employment and had a family and wanted a position on the road; that he did not know there was such a train as that fast through train on the road at that hour, but he knew that there was an accommodation train from Philadelphia due there soon after that time, and that it would stop for a few minutes at Claymont station, and his intention and expectation was to be there before it arrived, and inform the conductor of that train of the obstruction, as one which he had just discovered on the road, and could not remove, but had come back to the station in time to inform him of it, and by that means to secure the approbation and favor of the company, and obtain a position on the road; but the first intimation he had of the approaching express or fast through train was the blowing of the whistle of it as it passed Claymont station, and he became excited and ran to stop it as it came towards him, but the engineer did not see or notice him, an he then soon heard the crash of it. He was then asked if he would make that statement before the jury at the coroner's inquest, and replied that he would, and that he would do every thing in his power to make reparation for the wrong he had done. He afterwards was taken with the coroner and the jury of inquest from Wilmington in a car up the railroad to view the place, and voluntarily showed them how he placed the cross-tie as an obstruction on the track, but then stated that when he heard the whistle of the train blow, he suddenly seized it and pulled it out of its place, and threw it aside, as he then thought, clear of the track, but he was terribly excited and as soon as he got it out he started in a run to signal the train which he heard coming.
It further appeared from the evidence on behalf of the prisoner that he came from Maine into this State in 1864, and soon after was employed as a brakesman on the Delaware *Page 544 
Railroad, by the Philadelphia, Wilmington and Baltimore Company as the lessees of it until 1869, during which time he had been promoted with increased pay, but not being content with his position and compensation, he voluntarily resigned it and returned to the State of Maine, having in the meantime married and settled in Wilmington. He remained in that State but three or four years, when he returned to Wilmington and again sought employment in the service of the railroad company without success, and having been without any employment for a considerable period immediately preceding this occurrence, he was very much depressed and distressed over the condition in which he found himself, and so much changed in his character and deportment, as to lead a large number of his acquaintances to think that he was not n his right mind before and at the time when the act was committed, and who expressed that opinion as witnesses in the trial. It was also proved that whilst he was employed on the Delaware railroad, he sustained a severe and critical injury in 1868 which affected his brain for the time being, and from the effects of which he did not sufficiently recover to resume his place on it under six weeks, and afterwards in 1873, that he suffered a sunstroke on the line of it in transferring baggage during a very warm day, which came very near proving fatal to him at the time, and again in January 1877 after his return to Maine he was prostrated and rendered insensible for a time and until for work for several days afterwards, by a falling limb two inches in diameter striking him on the head while he was falling pine trees in a tract of land owned by him and a brother of his living in that State; and finally by numerous other witnesses who had known him well for several years, that he had not only been a man of good and peaceable character, but kind and gentle disposition.
Among many other witnesses called to testify to his mental condition, were several of the jurors who served on the inquest in the case, and when the first one of them *Page 545 
sworn was asked what were the actions, manner and appearance of the prisoner, and what impression they had made upon him as to the soundness or unsoundness of his mind on the occasion of the inquest, the question was objected to because it related to the state and condition of his mind subsequent to the commission of the act.
Lore, for the prisoner. The state and condition of the mind of a party is proved like other facts, to the jury; and evidence of the state of his mind, both before and after the act done, is admissible. 2Greenl. Ev. Sec. 371.
The Court differed, the Chief Justice and Judge Wootten holding the objection to be a good one, and Judges Houston and Wales that the evidence was admissible; the objection failed, and the witness was allowed to answer the question propounded to him.
Several of them then testified after stating his actions and conduct on that occasion, that they thought him to be of weak and unsound mind.
Gentlemen of the Jury: The prisoner at the bar stands indicted of the crime of murder of the first degree; and it devolves upon you to say, by your verdict, whether he is guilty in manner and form as he stands indicted. If you shall determine *Page 549 
that he is not so guilty, you are to consider whether he is guilty of murder in the second degree. Should you not believe from the evidence that he is guilty of either degree of murder, you are to enquire whether he is guilty of manslaughter only. We feel warranted in saying to you, from the undisputed proof made in this case, that the prisoner at the bar stands guilty of one or the other of these crimes; unless he has shown by proof that at the time of the offense committed, he was not responsible for his conduct.
On the 29th day of June last a terrible disaster occurred in this county, resulting in the death of four human beings, from what is called, significantly, the wrecking of a train on a railroad. On that day, a short time after ten o'clock on the night of that day, a passenger express train of the Philadelphia, Wilmington and Baltimore railroad Company, whilst it was pursuing its lawful progress along the line of the Company's road, a short distance below Claymont in Brandywine hundred, was suddenly arrested or stopped by coming in collision with an obstruction, being a log, or cross-tie as it is commonly called, placed upon the track by the prisoner at the bar (as was confessed by him) and two of the valuable servants of the corporation, George Babe, and his son, George Babe, Jr., then upon the train in the course of their employment as engineers, and two other persons, also upon the train, were killed in consequence of such collision. There is no question about the collision, or the injury resulting, nor that Harley G. Brown, the prisoner at the bar, caused both. Of what offense then, in legal consideration, is he guilty? For as there is no pretense that he had any right to place the obstruction upon the track, nor that such obstruction was not the cause of the disaster, we repeat that the prisoner before you is unquestionably guilty of one or the other of the great crimes I have mentioned, and of which of them it is your province to say, as triers of that question, after we shall have given you the law applicable to all cases of homicide, or manslaughter, unless you shall find him so *Page 550 
destitute of reason, or so insane as to be irresponsible for his acts. We should not be unwilling to say to you, if we could, notwithstanding the fact that the two inoffensive and valuable citizens, and also faithful servants in their calling (to say nothing of the two other persons above referred to) lost their lives by this dreadful occurrence, that the prisoner is, in our opinion, not guilty of either of these offenses and instruct you to acquit him of all crime; but this we cannot do. Unless it has been shown to you that the party charged is not, on any ground, a person responsible for his acts and their consequences, we and you must hold him liable for them. That you may decide which of the crimes mentioned the prisoner committed, if either, we proceed to define them, with appropriate examples. But first as to the homicide generally.
All homicides, or killing of one man by another, are criminal or not. Those which are criminal are characterized as murders, or as manslaughters. Those not criminal are such as the law justifies, or excuses; but with them we have nothing to do in this case. There are three classes of criminal homicides, murder of the first degree, murder of the second degree and manslaughter. They are all felonious homicides also; as distinguished from justifiable and excusable homicides, which are not felonious. Both the classes of murder are distinguishable from manslaughter in this, that malice is an ingredient, or feature, of them; whereas it is entirely wanting in manslaughter.
Murder of the first degree is, by the statute law of this State, in effect, where one rational being kills another person with express malice aforethought, or in perpetrating or attempting to perpetrate any crime punishable with death. Any killing with malice implied in law, is murder of the second degree.
Express malice aforethought is when one person kills another with a sedate, deliberate mind and formed design; such formed design being evidenced by external (or outward) circumstances, discovering the inward intention; *Page 551 
as, lying in wait, antecedent menaces, former grudges, and concerted schemes to do the party bodily harm; the deliberate selection and use of a deadly weapon, knowing it to be such; a preconcerted, hostile meeting, whether in a regular duel with seconds, or a street fight mutually agreed on, or notified and threatened by the prisoner, c.
Implied malice, or malice in a legal sense, is where any deliberate, cruel act is committed by one person against another, however sudden. Thus, where one person kills another suddenly, without any, or without a considerable provocation, the law implies malice; for no person, unless of an abandoned heart, would be guilty of such an act upon slight or no apparent cause. So if a man willfully poisons another in such a deliberate act the law presumes malice, though no particular enmity can be proved. And where one is killed in consequence of such a willful act as shows the person by whom it is committed, to be an enemy to all mankind, the law will infer a general malice from such depraved inclination to mischief. Malice is an inference, or conclusion of law upon the facts proved to the jury; and, among these, the actual intention of the prisoner becomes an important fact; for though he may not have intended to take away life, or to do any personal harm, yet he may have been engaged in the perpetration of some other felonious or unlawful act, from which the law raises the presumption of malice. Thus if one attempts to kill or maim A, and in the attempt by accident kill B who was his dearest friend or darling child; or if one, in the attempt to procure an abortion, cause the death of the mother; or if, in a riot, or fight, one of the parties accidentally kill a third person who interfered to part the combatants and keep the peace, the law implies malice, and the slayer is held guilty of murder. And though other agents intervene between the original felonious act and its consummation, as if A gave poisoned food to B intending that he should eat it and die, and B, ignorant of the poison, and against the entreaty of A give it to a child who dies thereby, or it is voluntarily tasted by *Page 552 
an innocent third person by way of convincing others of his belief that it is not poisoned (as in the case of the apothecary into whose medicine prepared by him for a sick person another had purposely mingled poison) the law still implies malice, and the slayer is held guilty of murder. Malice may also be proved by evidence of gross recklessness of human life, whether it be in wanton sport, such as purposely and without intent to do hurt, riding a vicious horse into a crowd of people, whereby death ensues, or by casting stones or other heavy bodies, likely to create danger, over a wall, or from a building with intent to hurt the passers by, one of whom is killed; or where in any other manner the life of another is cruelly and grossly endangered, whether by actual violence, or by inhuman privation or exposure, and death is caused thereby. And whenever the fatal act is committeed deliberatly, or without adequate provocation, the law presumes that it was done with malice (that is with an evil purpose or design) and it behooves the party charged to show by evidence, or inference, from the circumstances of the case, that the offense is of a mitigated character, and does not amount to murder.
Now, applying the law, as thus delivered to you, to the act of the prisoner at the bar, his deliberate act of placing the obstruction upon the railroad track, from which, according to the testimony of the witnesses for the State, death, or great bodily harm to some of those upon the train was likely to ensue, and which consequence the prisoner, as a former servant of the company must in all reason to be taken to be aware of, unless you are convinced that his motive for placing the obstruction was what he declared it to be at the time of his acknowledgment that he was the actor in this dreadful and most disastrous tragedy, he is certainly guilty of one or the other of the degrees of murder, as we have defined them to you. In addition, let me say to you, and enjoin you to bear in mind, in your consideration of this case, that all homicides not justifiable or excusable (and the one you are considering *Page 553 
is neither) are, in point of law, malicious; and also that every sane man is conclusively presumed in law to contemplate, that is, intend or design, the natural and probably consequences of his own acts. Harley G. Brown, then, if you disbelieve his statement of purpose, certainly designed to kill his victim by the obstruction to produce the collision, which would be express malice aforethought, and murder of the first degree, or he had a general malignity or design of mischief and recklessness of consequences to the lives and persons of individuals, under the circumstances of imperilment shown by this case, that would bring him within the description of those who are enemies of all mankind, persons regardless of social duty and fatally bent on mischief and therefore guilty of implied malice, or of the crime of murder of the second degree. It is for you, gentlemen, to say of which of these crimes, if of either, you think the prisoner to be guilty. If, however, you feel constrained, after all that has been said of the law, to believe the statement the prisoner made of his motive, and thus reach the conclusion that there was no premeditated wickedness in his act, you may find him guilty of manslaughter only; and we proceed to define that offense to you.
Manslaughter is the unlawful killing of another, without malice either express or implied or without premeditation. This is its general definition. It is also manslaughter, where one in doing an unlawful act, not felonious nor tending to great bodily harm, undesignedly kills another; or in doing a lawful act without caution, or requisite skill. Thus, if a person upon a sudden heat of passion caused by great provocation kills another, the law, if there be no circumstances showing malice, adjudges the offense to be merely manslaughter. So, if one shooting at another's poultry wantonly, and without intent to steal them, accidentally kills a man, it is but manslaughter; so, if he throws a stone at another's horse and accidentally kills a man; so, if one playing a merry, but mischievous prank, cause the death of another where no serious hurt was intended, *Page 554 
as by tilting up a cart, or the like, it is manslaughter. But if the sport intended was dangerous, and likely in itself to produce great bodily harm, or to cause a breach of the peace, these circumstances might show malice, and fix upon the party the guilt of murder. These are instances of manslaughter where the act of the party is an unlawful one. But though the act be in itself lawful, yet if done in an improper manner, whether it be by excess, or culpable ignorance, or want of due caution, and death ensues, it will be manslaughter. So it will be manslaughter if a person is killed by ignorance, gross negligence or culpable inattention, on the part of one assuming to be his physician or surgeon; or, by the negligent driving of a cart or carriage, or the like, ill management of a boat, or by gross carelessness in casting down rubbish from a scaffold, or the like. And, generally, it may be laid down that where one, by his negligence, has contributed to the death of another, he is responsible. The caution the law requires is not the utmost that can be used, but such as is used in like cases, and has been found by long experience to answer the end. You will observe therefore, gentlemen, that where death ensues from an act although not of evil or wicked purpose but barely unlawful, it is manslaughter in him who perpetrates it, and would be murder if occasioned by such purpose, which is malice.
We have given you, gentlemen, the law of this State, taken from the books of authority, on the subject of the two different kinds of murder, and manslaughter; and also examples to guide you in your duty of making up a verdict upon the facts in evidence before you; but that there may be no want of knowledge, or misapprehension on your part, we repeat:
1 — That where one, in pursuance of any deliberate purpose, or plan of taking another's life, or doing him some great bodily harm, kills him, he is guilty of murder in the first degree; so, if he purpose to commit an act punishable with death, and in the execution of such purpose he kills another. *Page 555 
2 — Where there is not the evidence of any such purpose or plan, and yet a person is killed in consequence of a felonious act on the part of the accused, or of an act that denotes a disregard, or recklessness of the lives and persons of individuals generally, it is murder in the second degree. And all homicides above the grade of manslaughter, and not reaching that of murder of the first degree are murder of the second degree.
3 — Where there is no malice, or evil design, either in fact or in law, and yet death ensues from a merely unfortunate act, or from a lawful act done in an improper manner whether by excess or culpable ignorance, the offender is guilty of manslaughter.
In connection with this it is proper to say that the prisoner at the bar was unlawfully upon the track of the railroad company; he had no business there, but was a trespasser, and his act of obstruction was an aggravation of his trespass. Therefore, should it turn out that you find yourselves unable to bring him in guilty of one or the other degrees of murder, you should convict him of manslaughter.
Whether the crime of the prisoner at the bar is reducible to the grade of manslaughter depends entirely upon your belief of his motive, as he gave it, for placing the log, or tie upon the track of the railroad. Of that motive you have only his own statement to rebut the legal and rational presumption that by that act he intended the consequences, whatever they might be that should result. You may, if you feel that you are constrained to do so, believe his statement and acquit him of malicious homicide, and find him guilty of manslaughter. But you are not bound to believe that statement, though you must consider it along with what he said against himself. In all cases of admission the whole of what the party said at the same time and relative to the same subject should be given in evidence; but it does not follow that all parts of the statement are to be received as equally worthy of credit; for the jury is to consider how much of the whole statement *Page 556 
they deem worthy of belief, including as well the facts asserted by the party in his own favor as those making against him.
But in this case the learned counsel for the prisoner at the bar in his well-made and able defense of his client, alleges and insists before you and this Court, that, as well before as after, at the time when the act of the prisoner, so terrible and destructive of human life in its consequences was committed or done, he was insane, or had not sufficient mind or reason to distinguish between right and wrong. This is the nature of his plea for the prisoner — that he was at the time when George Babe was slain and the preparation for the catastrophe near Claymont was made, a person not only of unsound mind, but that such unsoundness was of that extent, or completeness that it made him, as to the act committed, an unaccountable being. If this be true in point of fact, and you are the sole judges of that, then you should render a verdict of not guilty in this case. It would be an ineffaceable stain upon the reputation this State is entitled to for the tender regard her laws have of human life, and a lasting reproach to you as jurors, if an irresponsible being should be punished for that he did not and could not know was a crime at all. In all jurisdictions everywhere and among all peoples, civilized or savage, a defect of reason that renders one unaccountable for his acts is viewed with commiseration, and the subject of it shielded from the least reproach even. It is one of those visitations of the Creator which all humanity respects, and which confers immunity from punishment upon him who is so unfortunate as to be the victim of it, if I may use an expression of seeming irreverence. And the law so well shields or guards against punishment for an act committed under its influence, that when once insanity is established by proof, it is presumed to continue until restoration to reason has been established by evidence also. But until it is shown to exist, another rule of law of equal force prevails, which is this; that every man is presumed to be sane, that is, responsible for his *Page 557 
acts, until the contrary be shown by him on his behalf. These are maxims of the law and by keeping them in your minds you will be greatly aided in finding your verdict upon this indictment, which charges the prisoner with the murder of George Babe in a variety of forms of statement, though all substantially the same.
Every man, therefore, is treated in law as sane until the contrary appears; and Harley G. Brown was a sane man in the eyes of the law, and you are bound by your oaths so to regard him, unless he has shown to you by proof that at the time he placed the fatal cross-tie on the track of the Philadelphia, Wilmington Baltimore railroad, he had not sufficient mind or reason to understand that he was doing a wrongful act. That you may be the better enabled to consider this subject satisfactorily, we proceed to give you to understand what insanity or irresponsiblity for crime is. Insanity is inability to distinguish between right and wrong in reference to the act itself, and the want of power in the actor to choose whether he will do it or not. Again it is a state of mind in which a person is incapable of the perception or consciousness of right and wrong as applied to the act he is about to commit, and has not the ability, through want of the consciousness, to choose by an effort of the will whether he will do the deed or not. These definitions or descriptions of insanity were made by this Court long since, and have ever been approved for their comprehensiveness. They mean that one so destitute of reason as not to know at the time he does an act that he is doing wrong, is not responsible for such act.
Now, gentlemen, that we have given you to understand the state of weakness or derangement of intellect that will excuse crime, you may lay such information alongside, as it were, of the testimony of the witnesses produced by the prisoner, and determine whether that testimony is sufficient to protect the prisoner against an adverse verdict. And while we shall not, as we have not the right to do, express any opinion upon the nature of that evidence as it strikes our minds, it is our duty to warn you to *Page 558 
be very careful before you allow it to control your minds. The worst that was proved with reference to this subject anterior to the commission of the act, was that the prisoner was subject to seasons or periods of low spirits. We need not remind you, though it is right we should do it as a fact of common experience of which you have the right to take notice without any proof, that a great many people, perfectly responsible criminally as well as civilly for all their acts, or conduct, are subject to low spirits. Nay, it would be hard to point out any who are entirely free from them, unless they are of that small class of accountable human beings who seem to be incapable of ever taking any but a roseate review of life. It is true some are very much more under the influence of a low state of feeling than others; and not a few of our fellow creatures are at times hypochondriac; but even that is not any evidence, without other facts, of a want of knowledge of the right or wrong of an act. There must be something more, in our opinion, than this; there must be superadded to mere low spirits a natural weakness of mind or acquired insanity, that renders its possessor incapable of determining when he is about to do a thing, whether it is right or wrong to do that act. He must be, in fact, in the same state or condition of incapacity to distinguish between wrongful and rightful act, that is a babe in its mother's arms. And as the law will not, because it has no means to do it, measure the capacities of men, where there is any to be measured; so it holds every person responsible for the natural and probable consequences of his acts, or conduct, who has any capacity to distinguish between their rightfulness or wrongfulness. Without some such capacity there can be no will, for there is no mind, and without will or mind to do an act, no intent to do it can be predicated, or assumed of any man's conduct.
I have said there is no evidence whatever before you that the prisoner at the bar was anything but low spirited before the time he caused the death of George Babe and the three other victims of his conduct; and there is none. *Page 559 
It is true an accident is proved to have happened to him in 1868; that he fell from exhaustion, or from what is known as sun-stroke in 1873; and received a blow from the falling limb of a prostrated tree in 1875, but none of the witnesses who proved these circumstances prove that, his mind, or power to distinguish between right and wrong was affected, more than for a few weeks at most, and during that time it is not averred by the witnesses that there was an unusual appearance of mental affection. This, as I recollect, seems to be the substance of the testimony as to the prisoner's mind before the act committed. The first evidence you have having any tendency to show want of responsibility points to a period subsequent to the tragedy, and is mainly that of persons who served upon the coroner's jury. They have expressed their opinions with respect to the state of the prisoner's mind as shown, they consider, by his conduct, at the time the inquest was upon its travels to ascertain the facts about the killing of the four men who met their untimely deaths upon the fatal train, and passed without the least warning into that dread hereafter for which the best among us are in need of some preparation. Those opinions if we give all of them, at least, as much, if not more force than they all expressed, amount to opinions only of men, certainly not any better qualified than yourselves to draw conclusions from facts. They are not experts, that is, persons of scientific skill, on experience, so far as you or I know, to pass upon the mental states of men. They have, therefore, no special qualification to enlighten your minds upon a subject that has oftentimes baffled the scrutiny of the specialist, or person who has made a study, or specialty, of the subject of insanity. But they do give you facts and it is for you alone to judge whether, in your consciences, you believe them to be such as should acquit the prisoner. It seems, from the testimony of these jurymen that when the coroner took the prisoner to the scene of the wreck, he gave to them the same account of his performance on that fatal night of the 29th of June last, that he had given before *Page 560 
to the witnesses for the prosecution; but the latter, we may suppose, discerned nothing in his conduct or manner which challenged their attention, more than, perhaps, the natural concern which one not a fiend or idiot, would evince when reviewing the scene of his most dire transaction. The witnesses for the defense describe his agitation, haggardness, apparent absence of mind, in biting his that and finger nails, and wild look out of the eyes. This is that upon which they base their opinion that he was then not in his right mind, or capable of distinguishing right from wrong. Could any mortal being be expected to be calm, self-possessed, sedate, when confronted with the accessories of such a disaster, and standing upon the very spot where it occurred ? We leave the answer to that to you, who alone are to deal with the facts of this case. We forbear to go one step even further in presenting this testimony, lest we may in some way, not legitimate for us, influence your minds with respect to the weight you ought to allow it to have in making up your verdict.
Finally — if you should not be satisfied in your minds beyond a reasonable doubt, that is, unless you should be clearly of opinion upon the evidence before you, that the prisoner meant in fact to produce, or in legal presumption contemplated the consequences of his unlawful act, you should acquit him of either degree of murder, and convict him of manslaughter only. In such case your verdict should be not guilty in manner and form as he stands indicted, but guilty of manslaughter. On the other hand you should find him guilty of murder of the first, or murder of the second degree, as you may consider the testimony will warrant you in doing. And if, after considering the whole case you shall not be satisfied in your own minds, from the testimony of the witnesses, that the prisoner at the bar, at the time of the wrecking of the train and the killing of George Babe, was capable of knowing that he was doing a wrong act, you should find him not guilty of any crime.
 Verdict, — Guilty of manslaughter. *Page 561